Good morning, Counsel. Good morning, Your Honor. Nicholas Porrett of Levy & Kuczynski on behalf of the Plaintiff Appellant. Your Honor, this is an appeal from the grant of a motion to dismiss under 12b-6 by the District Court of a securities class action filed against Arrowhead Pharmaceutical and various individual defendants. So it is accordingly reviewed de novo. And as the Court is aware, statements, allegations in the complaint are taken as true. Plaintiff, even under the securities class actions under the PSLRA, are entitled to all reasonable inferences to be drawn in their favor from those facts. But at the end of the day, what we're really struggling with here are the requirements of the PSLRA, right? And two in particular. Your Honor, yes. I mean, 20 years on from when it was enacted, the PSLRA still, I think, troubles or it's difficult to apply in many circumstances. And how it is, and this is the Ninth Circuit recently addressed in the Orexogen case, how you balance the PSLRA and its policy concerns with the general posture at a 12b-6, particularly as the PSLRA also includes a discovery stay. And so you have a information imbalance between defendants and plaintiffs. And plaintiffs are required to plead and meet the highest pleading standards, I think, under the federal laws, certainly in civil cases, without the benefit of any discovery. And how the Court has to balance that policy versus not dismissing viable claims. And I concede it's not an easy job. We think here the District Court got it wrong. We think we pleaded viable claims here with detail as required under the PSLRA and governing Ninth Circuit statute. So obviously we urge reversal. The case here, in many ways, is actually quite relatively simple, although it has a lot of technical jargon. But it involves a pharmaceutical company and their lead drug candidate, which was a drug targeting the hepatitis B virus. I'll refer to it, fortunately, as easy as ARC-520 or just 520. And more importantly, that involved a delivery system that referred to as DPC, which had been under development initially by Roche and then purchased by Arrowhead. And that delivery system had been developed for a number of years. And the issue with that delivery system, although I was sharing promise, was that it resulted in high toxicity. And that had been discussed by the company and by other analysts and experts in the industry for years leading up to the class period. I know, again, I know you have a prepared statement. With respect to Higgs and Rosanna, it seemed like the only fact that you have supporting that they have personal knowledge over their respective allegations in your complaint is their position. Is that enough under the PSLRA? Well, I think it's unfair or perhaps a little bit slight to say just their, quote, position. I mean, Ms. Higgs was a chemist who worked directly on the peptide that causes as a result of the toxicity. So she's a chemist. So she has all that information. My point is simply this. You can have in a company, you can have hierarchy. And let's say you have somebody at the top, maybe highly qualified, but what you're alleging occurred farther down. And it seems like you're making an assumption that because someone is at the top of the organizational chart, they must have known what somebody farther down in the system knew. And I'm asking you, if I'm interpreting your complaint correctly, is that sufficient to satisfy the requirements of the PSLRA? And I would say, with respect, I don't think that's fairly interpreting our allegations. Well, let's just say hypothetically. And if it was, the answer would be, and I hate to give a lawyer answer, but it depends. Which depends on all these cases, as your honors are aware, are very fact-based. So if you're talking about a company the size of U.S. Steel or General Electric, then I'm not sure you can attribute the CEO of U.S. Steel with knowledge. The size of the company that makes the difference here. You think that because there weren't that many people, they, in quotes, must have known, in quotes. I think it's a fair, it's a reasonable inference. I mean, there's been talk about it's sometimes dressed up as so-called core operations doctrine, which I think doesn't need to be dressed up as a doctrine. I think it's just, is it a reasonable inference or not, which this court has been doing for 20 years after the PSLRA. The size of the company is certainly a relevant factor. The subject matter of what we're talking about. Its importance to the company. It's really, as the Ninth Circuit described in the South Ferry case, I mean, applying common sense. Is it really credible to say that the CEO, for instance, or senior management did not know about, say, the outcome of a key clinical trial. Or the safety profile of its key drug candidate that's been developing for five years. Which the entire future of the company depends upon. And which they then make public statements about its safety. So when you have that profile, I think it's very reasonable. I think it's an unreasonable inference to say, but they were unaware of the outcome of particular studies, for instance. I don't know if that answers your honest question. Well, in a way, of course, in this case we have to get to what they said. But I wanted to see first whether you felt that just by virtue of their position it was enough. Because I find the allegations very tenuous in terms of how they get tied into it. Other than their position. So, I'll try and break it down. Because I would agree with your honor that I think all the legal conclusions kind of follow from a couple of key factual questions. And once again, I would stress, I'll repeat my opening speech. This is on a motion to dismiss. It should be a plaintiff friendly interpretation of the facts. Which I'm not sure the district court necessarily gave us. So, from Ms. Higgs, her knowledge testifies to the fact that the DPC technology involves a peptide which creates toxicity at high dosage. And with multiple dosages. That is, she's a chemist responsible for developing the peptide. I think that is squarely within her personal knowledge. I think that also... Did she talk about multiple doses? Or just say that it can result in unsafe toxicity? I mean, that could be because you give way too much on one occasion. As opposed to the problem that you raise in your complaint, which is multiple doses. It's really a combination of the two. Which is that there's clearly a level at which the DPC technology creates toxicity. And that could be from one very large dose. Or, as alleged, it can come from so-called dose accumulation. But she doesn't talk about dose accumulation, does she? She talks about... She said that it was the peptide that caused the deaths in the climate studies. Which I believe was a multiple dose study. And she also talks about the toxicity. I don't know if she talked about the dose accumulation, per se. But that's the theory of your complaint, is the dose accumulation, correct? That's the falsity that you're... I wouldn't say it's necessarily the dose accumulation. I would say it's the toxicity which was presented when you presented a multiple dose trial. Because that is the risk. This concern about the toxicity of the DPC technology, we would submit, is also corroborated by the FDA's reaction to the protocol design study. Which, as they said, if you're going to do multiple dosage, you have to start at the lowest dose. But they permitted the multiple dose. They didn't have a problem with a multiple dose study. They permitted that to go forward. It was just at a lower dose. It was at a lower dose, correct. So it's the combination of the multiple... But the concept of accretion by multiple doses, that the FDA didn't... that the FDA had a problem with that. As long as it's at one milligram. Not that they obviously... We would submit they would have a problem with the potential risk of toxicity presented when you're doing multiple dosages at two and four milligrams. Otherwise, there would be no reason to change the study. But can't the FDA have a concern that something might happen and therefore want you to go slowly in testing it, and that doesn't mean it will happen? I'm not sure how the fact that the FDA wanted to sort of slow down and do the one milligram or whatever it was, the one level testing first, shows that the FDA knew there would be a problem with the testing that would then happen. It's not our theory. No one is alleging that everyone knew in January 2015 that ultimately this toxicity would result and the whole study would fail. Because I would agree, and I agree with the Fourth Circuit and Cozzarelli, that makes no sense. No company would do a study that they knew would fail and just waste millions of dollars. What is the risk here, and it's the same risk that this court identified as material and misleading in ARENA, is the risk. Investors understand investing in pharmaceutical companies is a risky business. Of course we understand that. And I think you started by saying even before the class period everyone knew that this technology had a risk of toxicity. Correct, Your Honor. So the investors know that. So what is the thing that was a specific fact that they didn't know? They did not know that in the course of the development that this level of toxicity was still as severe a risk as the FDA had been communicated by resulting in the change in the protocol. And then later on in the class period they certainly didn't know that the toxicity was so severe that it had caused non-primate deaths, which ultimately led the FDA to conclude the study. What was the date of the primate deaths? So according to Dr. Rosemount, they died in either late 2015 or early 2016. And I understand the district court was critical that we weren't more precise. That is as precise as he can remember. He was one of the co-creators of the technology. He was working at a high level in the research department in Arrowhead during the class period, so he would be in a position to know that. I think that meets the Zucker requirement. Is it your position, kind of what I'm sensing, that if you have a company dealing with the FDA, an experimental drug, that in order to comply with the securities law you must basically almost have a daily report given to investors about how their experiments are going, if there's a success or not a success. If you say there's a success, then you don't know what's going to happen the next day. I find that a rather extreme position. Is that really where our securities law is today, that you've got to report every single thing from the lab when indeed everybody knows it's an experiment, everybody knows it's a risk? How far do we take this? Agreed, Your Honor, and I do want to reserve some time, but I would like to have three minutes if I can. But, no, the federal securities law is not an ongoing disclosure regime, as you know. It's a periodic disclosure regime. The question is, when you say, when you make a statement that says, this drug, ARC-520, has no dose-limiting toxicity, which they said multiple times, as alleged in the complaint, and the FDA has told you to limit the dose because of potential toxicity, I think that's a misleading statement. When you make a statement saying that you have seen no evidence of toxicity in any of our studies, and you have done primate studies which have caused death in those primates as a result of the toxicities from the drugs, that's a misleading statement. How do we know that the people who made the statements that you think were falsified by the primate deaths knew about the primate deaths? All right, so, once again, I think it's a reasonable inference based upon the importance of the size of the company, the importance of this drug and its studies, the fact that they were talking about primate studies, clinical studies. When an executive says, we have looked at the studies, and it shows no evidence of toxicity, I think it's reasonable to take that at their word, and certainly at the pleading stage, it's no excuse for them to say, well, in fact, when I said I'd looked at the clinical studies, in fact, I hadn't, or when I said I looked at the primate studies, in fact, I hadn't, I didn't know. That's not a reasonable defense. I don't believe that's the proper standard on the federal securities laws. Can you just point to the statement in the record where they said we're looking at the clinical studies, and it's clear that they meant the primate clinical studies? So they mentioned primate studies on several occasions, as alleged. So they start off paragraph 101 of the Second Amendment complaint. That's in May 2016. Paragraph 104, that's July 13th. Paragraph 108 in August 9th, talking about primate studies. August 9th in a conference call. They talk about all our studies. In paragraph 113, in an industry interview. So they talk about the safety profile, so maybe not specifically about the primate studies. And then finally on September 29th. So, I mean, the district court found, and this will be my last statement, unless you have immediate questions. The district court found that the statements in July and in September 2016 regarding primate studies would be misleading if, in fact, the primates had died immediately before that, before those statements, so any time before July. And we would submit that we pleaded sufficient facts to be entitled to that inference. Do you want to save the rest of your time there? I will, yes. I've got 50 seconds, I think. All right. Thank you very much. Thank you. Good morning. Good morning, Your Honors. Alex Mircheff for dependent appellees. Your Honor, this court should affirm the district court's judgment of dismissal because the gap between plaintiff's theories and a viable claim for securities fraud is a mile wide, and plaintiff hasn't carried his statutory burden to fill it with particularized factual allegations as required under the Private Securities Litigation Reform Act and numerous cases from this circuit. I want to focus on three main points, if I could today, concerning the core elements of a claim for securities fraud, falsity, scienter, and loss causation. As to falsity, plaintiff has not pleaded any particularized facts, showing that defendants' concededly accurate statements about their research progress. I want to suggest that counsel added a number of words to the statements in the record there, so I think it's important to focus on the actual statements, which, again, at AOB 29, there's a concession as to veracity. What their theory is is that the statements were nonetheless misleading, but no particularized factual allegations suggested that the core factual premises existed, including because of a supposed secret dose accumulation problem or anything else. Well, weren't there two statements, though, that the district court found would have been materially false based upon which date you accepted for the primates dying? And isn't that at least an issue of fact as to what the date was? So on the date, it's not an issue of fact because, again, of the particularized pleading requirements under the PSL, right? Well, they have someone who was in a position of authority there. The district court says his best memory was late 2015, early 2016. Why isn't that sufficient? I would suggest, Your Honor, is that the standard under the Zucco test, which relies on the Second Circuit standard and no vacuums, are there particularized factual allegations to show that a person, the source of the allegation actually has personal knowledge? And that flows directly from the statutory requirement under the PSLRA. So just as the plaintiff can't- So the plaintiff didn't actually know about the primate deaths? That is correct and not supported by particularized factual allegations for a number of reasons. Are you also saying that the person who made the statements they point to didn't know whatever the declarant knew? Are you arguing both? That is correct and not supported by particularized factual allegations. So, yes, the informant, we'll say, who was sort of named in the second amended complaint- As a title in the company, it's not just an undisclosed informant. I mean, in the amended complaint. We know who he is and we know what position he held at the company. That's certainly right, Your Honor, but that's really where it stops, right? So the title really is unilluminating. It's sort of a wrong department issue as we see it. So he's involved with chemistry. That's sort of the building of the product. That's not the testing. That's not the animal toxicology. That's not anything else other than the building of the product. So just the title can't get you there. So from your perspective, the PSLRA would require the named confidential informant, now we know who it is, to be able to say that another person was there, saw, heard that the primates had died, and they're the ones that made the misrepresentation. Is that what you're saying? If I understand the – I'm not sure I understand the question, Your Honor. What I'm looking at is how close the causal chain has to be in the allegations of the complaint. We know there can't just be conclusory statements. As Judge Allman just indicated, you've got an allegation in the second amended complaint that says you've got certain people who had certain titles. I understand your position to be that the people who made the public statement, there's no evidence that they knew what this person claims to have known. Is that correct? That is certainly correct, Your Honor, among many other reasons why the allegations are too big. If they're going to bridge that gap, they somehow have to show that the other people knew because they were told or there were these documents they were given or something that ties them in. Is that right? That is exactly right, Your Honor, and I want to speak to that. I do want to say that that is only one component of this. So they sort of don't get off the ground with even the informant. But to your point about what information did the speakers have, there is zero allegation about any of the core premises, the three core facts that are alleged in the complaint ever being relayed through any conversation, report, data. The sort of three core allegations are, I think, exactly what conjecture looks like. It's exactly what fraud by hindsight looks like. So they're invented, but there's also no support for the proposition that they were ever conveyed to the speakers. And that really goes to both falsity and scienter. But aren't the speakers assuming that they have some knowledge of what's going on when they make statements suggesting that they have the knowledge? For instance, they're saying, like Anzalone's saying about ARC 520, there are no signs of toxicity in these animals. It suggests he knows about that issue. So why wouldn't he be deemed to have known everything about that issue, which is that all of these animals died? Well, so I want to speak, because that goes to the content of the statement, which I agree is absolutely the starting point. So the statements in the record concern very specific studies, and really the ones that are at the core of how do you assess whether this drug is going to be safe and effective at the human therapeutic range? So the statements in the study are about the human clinical studies. That's, I think, Judge Friedland had pointed out, clinical in this context always means human, patients. Patients always means human. So the statements in the record are about, one thing, the human clinical studies, and the second thing, chimpanzee studies, which are done at the human therapeutic range. So they're not sort of about, and this is a key distinction between our case and the ARENA case that plaintiffs have cited so often, these are not statements saying all studies support FDA approval. That was where the company in ARENA got into trouble, because they were saying all of our studies, the animal studies, support FDA approval, when the plaintiffs were able to plead with particularity that the FDA had actually said, well, we have a concern because of the rat study. Right? So those are the particularized factual allegations. The district judge found here that at least two of your statements would have been material based upon the timing of the death of the primates. Do you agree with the district court on that statement that they would have been material? Not on that point, Your Honor, we don't. So I think Your Honor is referring to the July statement, again, regarding chimpanzees. September, I think. That's right, and a September 9th statement. So you think the district court was wrong about that? We do, and here's why. So the animal toxicology studies that were the subject of what plaintiff claims was a corrective disclosure, those are separate studies, and I think a reasonable investor would well understand that. Those are separate studies than studies at the human therapeutic dose and studies in chimpanzees at the human therapeutic dose. The animal toxicology studies are a different matter. How do we know that on this record, though? This is a motion to dismiss. What in the record talks about the fact that these were different animals? The different terminology that the speakers used. So the speakers were specific. When they were speaking about chimpanzee studies, they used the word chimpanzee. When they were speaking about other primates, they used the word primate studies. We've also cited guidance and regulatory action saying that in this time period, you wouldn't be doing animal toxicology studies on chimpanzees because they're endangered species. Another point is that the animal toxicology studies are really for a different purpose, and there's disclosures about this as well. The animal toxicology studies really are designed to understand the mechanisms of toxicity. So there's disclosures in the record saying, well, after some previous animal toxicology studies, they're referred to as GLP toxicology studies. The company is telling investors, well, as a result of those, we know what organs to look for when we start doing things at the human testing range. We'll know what organs to look for and focus on to see whether there, in fact, is toxicity. So those are a few examples in the record of reflecting that the animal toxicology studies really are fundamentally different than the doses at the human range. I want to suggest, though, even if that weren't true, even if that wasn't in the record, that would be plaintiff's burden to plead with particularity that the same animals were at issue, that there was something about the high-dose animal toxicology tests that fundamentally undermined the conceitedly truthful and promising results that Arrowhead was showing at the doses near the human therapeutic range, which really, those topics, the topic of the doses at the human therapeutic range, that is the topic of each and every one of the statements that are allegedly misleading. But the FDA thought it was significant enough once they learned about the deaths of these primates to shut down the study, right? Well, they called for a pause. That is true, and Arrowhead immediately disclosed the very day that it heard from the FDA. And I want to just suggest that's another critical point that distinguishes plaintiff's cases about the drug studies is that there you had companies making misrepresentations about the FDA's views. Here, Arrowhead, the very day it heard a verbal call from the FDA, issues a press release saying, look, this thing has happened. We don't believe it reflects a problem with the science at the human therapeutic range. We've shown excellent, excellent results at the human therapeutic range in terms of safety, in terms of efficacy. These animal toxicology studies, they're at higher doses than used in the clinic. This is all in the disclosures on November 8th and on November 29th. And so what you have here is it's a record of transparency. You have a series of risk disclosures that I think I heard counsel say. I mean, investors knew that what was being studied here is, you know, the question, is there toxicity, you know, associated with this product? And the statements at issue are conceitedly truthful reports of what the studies were showing that were being commented upon. So when there's a reference to, you know, a statement supposedly saying there are no dose-limiting toxicities with our drug, that's not what the company said. What the company said was, well, we've conducted these trials, and no dose-limiting toxicities were observed in those trials. That is a conceitedly true statement. And I think to Judge Ammon's point, there just is no particularized fact in the record. They even get plaintiffs off the ground of showing something falsifying or rendering those statements misleading. That's, you know, the falsity element. The scienter element, I think, to Judge Smith's point, is sort of, you know, the wrong department problem. I want to make a point as well. I think Judge Ammon, you were noting sort of the embellishment on the Higgs informant allegations, which are really just, you know, Higgs just says, well, the peptide made the drug unsafe. That is an extraordinarily vague allegation that even if it accurately reflects the views of Higgs, that is not a particularized factual allegation. A great example is in Judge Smith's case in Apollo. That was a for-profit education case. There was allegedly confidential witnesses in the room with executives having conversations saying, well, these students that are being admitted by the Apollo group supposedly were unfit, right? But there's no detail. Well, what does unfit mean? What is the detail that suggests that there was any fact contradicting the statements, let alone known to the defendant? So we think they fail on falsity right out of the get-go, even if somehow they get past falsity by sort of, I'm not sure what, embellishing on the statements or something. There's just zero facts suggesting that these defendants were ever relayed any of the premises that these plaintiffs have invented. We've also made that point that the plaintiffs have suggested that the FDA in 2015, you know, called for a short hold and a change of the study methodology because of this supposed dose accumulation concern. The easiest way to dispose of that is that plaintiffs don't even claim in conclusory fashion that the FDA ever, you know, said anything to Arrowhead about that. So they sort of have tried to get inside the heads of the regulators, but haven't even pleaded because they can't, that that, you know, concern, even if it was true, was ever communicated to anyone at the company. So to generalize, if one can, what you're saying, the statements that are made that your opponent declares are false, when you look at them specifically, they're referred to a particular animal study, a primate study, not a human study, and that they're extrapolating what is said about one particular study and kind of imposing it over the entire process. That's right. They're imposing their conclusions, which are unsupported by any particular facts, about the high-dose animal toxicology deaths, again, higher than clinical doses, and imposing their views about what that should imply about an entirely different matter that was the subject of the statements at issue, the human doses and chimpanzee studies at the human dose. So I think Your Honor is correct about that. Other questions? Very well. Thank you, Your Honor. Thank you very much. So we have a little bit of time left. My main point I would like to emphasize, as this court found in ARENA, is just being technically accurate and limiting what you're talking about does not give you a license to give a misleading impression of your overall drug candidate or clinical trial program. The statements in ARENA were completely accurate, but they were misleading because they failed to disclose the so-called RAT study. And so the question is, are you giving a fair assessment or description of the risk that investors are buying into when you purchase shares in this company? That is really what ARENA stands for, and that is what it stands for here. In ARENA, by the way, they didn't cancel the program. They actually got past the issues being raised by the FDA, and the drug is now being successfully sold. But even that was sufficiently misleading because it led to this particular delay, and there was a stock price decline when this risk they had to work through came apparent. So here we would argue that it's far stronger. Okay. Thank you. Thank you very much to both counsel. We appreciate this is an interesting and very challenging case. We will now hear argument in the final case of the day, United States v. Larkin.
judges: M. Smith, Friedland, Amon